FILED'06 JUN 12 15:43usdc-ore

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CORTEZ JORDAN,    )
          )
  Plaintiff,    )  Civil No. 05-6164-TC
          )
  v.      )  ORDER
          )
THE CITY OF EUGENE, a municipal  )
corporation; and WAYNE DORMAN,  )
an individual,     )
          )
  Defendants.   )
_____)

COFFIN, Magistrate Judge.

  Plaintiff has filed an amended complaint alleging that defendants violated his civil rights as guaranteed by 42 U.S.C. § 1983, committed a battery against him, and intentionally inflicted emotional distress upon him. Presently before the court is defendants' motion (#36) for summary

1 - ORDER

judgment.[1]

## BACKGROUND

The parties offer significantly different descriptions of the events leading to the filing of the instant lawsuit. Taken from the depositions of the individuals involved in those events and the affidavits and supporting materials on file, the following is a summary of what each party contends.

## I.      Defendant Dorman's version

Prior to going on patrol on September 4, 2004, Eugene Police Officer Wayne Dorman and other officers on his shift were instructed by their supervisor, Sergeant Scott Fellman, to pay particular attention to criminal activity at a local bar, Tsunami's, because of a history of criminal violence there, including fighting and disorderly conduct. Fellman also had learned that there were patrons of Tsunami's who were carrying weapons, and that there was a possibility for gang activity at the site. Fellman instructed the officers to watch for suspicious or criminal behavior, to lawfully engage persons coming from or going to Tsunami's, and to take any necessary law enforcement actions, within the bounds of the law, taking particular care due to the possible presence of weapons.

Dorman also had knowledge of the possibility for criminal behavior at Tsunami's, having been involved, as a law enforcement officer, in situations related to a stabbing and a vehicular assault that had occurred there. He also knew that another local bar, The Jungle, had recently installed a metal detector to prevent individuals carrying weapons from entering that bar, and that because patrons often went back and forth between Tsunami's and The Jungle, any individuals carrying weapons that had been refused admittance to The Jungle may well go to Tsunami's, which did not

---

[1]Also before the court is defendant's motion (#69) to strike evidence. Because the court does not need to consider that evidence to reach its decision, the motion is denied as moot, without prejudice to refile if necessary at trial.

2 - ORDER

have a metal detector.

After he started his patrol shift on September 4, 2004, Dorman picked up Ryan Lane, an off-duty Lane County Sheriff's Deputy, who was going to patrol with Dorman as a "ride along."

Shortly before 2:00 a.m. on September 5, 2004, Dorman was on patrol near Tsunami's with Lane riding along. Dorman saw a group of individuals, including plaintiff Cortez Jordan, crossing the street walking away from Tsunami's. Dorman observed that plaintiff was African-American, and that the four other persons in the group were white. Based on his training and experience, and particularly in light of the pre-patrol briefing he had received, Dorman believed that plaintiff was carrying himself like someone who had a handgun in their waistband (Dorman stated that Jordan was holding his hand on his waistband). Dorman also noticed that the group was crossing the street at less than a right angle, which was a violation of the Eugene Code and grounds for a citation. However, Dorman was concerned that if he stopped Jordan he would be accused of racial profiling. Lane then independently remarked that it looked like Jordan was carrying a gun. Based on his own suspicions, and Lane's independent corroboration, Dorman decided to investigate notwithstanding his concern about a possible complaint of racial profiling. Although Dorman could have stopped Jordan, and the whole group, for the pedestrian violation, he did not, but instead initiated the encounter based on his belief that Jordan was carrying a weapon.

Dorman parked his patrol car in a street across from Tsunami's, behind where plaintiff and his group were walking. He left his siren and main overhead lights off, but activated his rear, amber-colored overhead lights to indicate to oncoming traffic that a police vehicle was in the street. Due to heavy radio traffic, Dorman did not radio in that he was initiating contact with a citizen. He got out of the car and asked plaintiff if he could speak with him. Jordan responded, "Who, me?"

3 - ORDER

Dorman said "Yeah, can I talk to you for a sec?" Jordan then walked over to Dorman and they met at the front of the patrol car. Although Dorman had not then decided whether he would detain Jordan, he believed that if Jordan had attempted to leave he would more likely than not have detained him.

Dorman proceeded to ask Jordan if he was carrying any weapons, to which Jordan responded that he was not. Dorman asked Jordan if he could check, and Jordan indicated that he could. Dorman reached out and felt Jordan's waistband and did not notice any obvious bulges which would indicate the presence of a gun. Dorman then advised Jordan that he was contacting him because of the way he was walking across the street, which made it appear that he was carrying a gun. Jordan became defensive and told Dorman that Dorman was only stopping him because he was black, and that he was walking with his hand on his waistband because he was wearing a loose-fitting wristwatch. At some point, another member of the group stepped in and asked Dorman why Dorman hadn't questioned him as well. Jordan became animated and again expressed his belief that the stop was racially-motivated.

Lane interjected at that point and told Jordan "Don't play that card." Dorman told Lane that he, Dorman, would handle it, and Lane remained quiet for the remainder of the encounter.

Jordan was still visibly upset and was shouting at Dorman. Dorman advised Jordan that he was happy to talk to him about the situation but that he wouldn't stay there if Jordan was going to continue to shout and yell. Jordan then calmed down and he and Dorman began talking. Sometime during their conversation Dorman asked Jordan for his first name so that they could talk on a more personal level. At some point Jordan again began to get upset, took off his shirt and demanded that Dorman do a full search of him because Dorman had embarrassed him in front of his friends when

4 - ORDER

he claimed Jordan had a weapon.  Although Dorman no longer believed Jordan was carrying a

weapon, he agreed to search Jordan.  Dorman told Jordan to turn around, and he ran his finger

around Jordan's waistband and down the outside of Jordan's legs, and possibly Jordan's ankles.

Jordan seemed satisfied, he and Dorman again talked briefly, and the encounter concluded.  In its

entirety, the encounter took less than two minutes.

## II.    Plaintiff Jordan's version

Jordan and a group of friends were at the Tsunami's bar on the night of September 4, 2004,

and he left the bar with four friends around 1:30 or 1:45 in the morning on September 5, 2004.

Although some of his friends had been drinking, Jordan had not.  After the group left the bar, Jordan

saw a marked patrol car driving by on Centennial Loop.  After the vehicle passed, Jordan and his

friends crossed the street towards where his car was parked.  The patrol car then turned around and

stopped between the group and Jordan's car, and turned on its overhead lights.  Although Jordan

could not recall what color the overhead lights were, he believed they "were coming towards [him]."

Dorman told Jordan that he needed to speak to him because it looked to Dorman like Jordan was

carrying a weapon.[2]

---

[2]There is some difference in Jordan's description of the manner of Dorman's approach
between Jordan's deposition and his affidavit.  In his deposition, plaintiff answered questions of
opposing counsel as follows:
    Q.  And Officer Dorman got out and he asked if he could speak to you.  Right?
    A.  Yes, sir.
    Q.  And you turned around and said, who, me?
    A.  I believe I said that, yes.  I believe that's what happened.
However, in his affidavit, plaintiff stated that "Officer Dorman told me that he needed to speak with
me because I looked like he [sic] was carrying a weapon because of the way that I was holding my
arm and the way that I was walking."  Giving plaintiff the benefit of all favorable inferences, the
court will assume that this part of the encounter occurred as described in plaintiff's own language,
from his affidavit.

Jordan told Dorman that he didn't believe Dorman was in a position to observe whether Jordan had a weapon. Dorman searched Jordan's waistband. Dorman did not give any indication that the encounter was over, and Jordan believed that because Dorman, a uniformed officer, had accused him of carrying a weapon, he was not free to leave. Jordan stated that he did not understand how Dorman could think he had a weapon based on the manner of his walk. When Dorman described the way he believed plaintiff was walking, with the way he was carrying his arm suggesting a weapon, Jordan said he had a loose watch, but that his watch didn't have anything to do with his waistband. Jordan did not believe that he or any of his group were acting suspicious, or that he was walking any differently from his companions, nor did his companions believe he was acting any differently then they were. One of his companions has testified that Jordan was walking with his arms swinging freely, as she was imitating him in that respect. Dorman continued to talk to Jordan, and Jordan remained under the belief that he was not free to leave.

One of Jordan's friends came over to stand by him, and Jordan accused Dorman of stopping him because of his skin color. Jordan told Dorman that he was a city employee, that he had the right to freely assemble, and that Dorman's conduct had embarrassed him because Dorman had singled him out and not questioned any of Jordan's white friends. Deputy Lane piped in and said "Don't play that card" or "Don't pull that card." Jordan responded to Lane that he wasn't talking to him. Dorman told Lane "I'll take care of this."

Jordan remained offended at Dorman's accusation, and asked Dorman to conduct a pat-down search to prove that he wasn't carrying a weapon. Jordan took off his sweat suit top. Dorman patted down Jordan's torso and legs. Upon finishing the pat-down, Dorman did not find a weapon, and Dorman and Jordan went their separate ways. The encounter lasted between ten and fifteen minutes.

6 - ORDER

## STANDARD OF REVIEW

A party is entitled to summary judgment as a matter of law if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); Bahn v. NME Hosp's, Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). The moving party must carry the initial burden of proof. This burden is met through identifying those portions of the record which demonstrate the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Id. The facts on which the opponent relies must be admissible at trial, although they need not be presented in admissible form for the purposes of opposing the summary judgment motion. Id.

The court must view the evidence in the light most favorable to the nonmoving party. Bell v. Cameron Meadows Land Co., 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. Hector v. Wiens, 533 F.2d 429, 432 (9th Cir. 1976). The inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Valadingham v. Bojorquez, 866 F.2d 1135, 1137 (9th Cir. 1989). Where different ultimate inferences may be drawn, summary judgment is inappropriate. Sankovich v. Insurance Co. Of North America, 638 F.2d 136, 140 (9th Cir. 1981).

Deference to the non-moving party does have some limit. The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). Where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Electric Industrial Co., Ltd. v. Zenith

7 - ORDER

Radio Corporation, 475 U.S. 574, 587 (1986). The "mere existence of a scintilla of evidence in support of the plaintiff's position would be insufficient." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 252 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Id. at 248. However, trial courts should act with caution in granting summary judgment, and may deny summary judgment "in a case where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

## DISCUSSION

I.    **Plaintiff's § 1983 claims against Dorman**

Defendant Dorman seeks summary judgment on plaintiff's § 1983 claims against him on the basis of qualified immunity.

A district court can make a pre-trial finding that individual governmental agents have qualified immunity from a suit stemming from actions taken in their official capacity if, considering facts and inferences in the light most favorable to the plaintiff, the officials were entitled to qualified immunity as a matter of law. The appropriate analysis in considering qualified immunity as a matter of law was enunciated by the United States Supreme Court in Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151 (2001).

According to the Court in Saucier, the inquiry is twofold. First, the court must consider "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 2156. If this question is answered in the negative, the defendant is entitled to summary judgment. If, however, a constitutional right could have been violated, a second question must be asked: was the constitutional right at issue clearly established? Id.

Plaintiff's complaint alleges that Dorman stopped and searched him without an appropriate legal basis, violating his Fourth Amendment rights. Therefore, for this portion of his complaint, the first part of the Saucier analysis is whether, taking the evidence in the light most favorable to the plaintiff, the events of the early morning on September 5, 2004 violated Jordan's Fourth Amendment right to be free from unreasonable searches and seizures. So viewing the evidence, it is clear that plaintiff has presented facts which would constitute a Fourth Amendment violation.

Defendants' argument to the contrary largely stems from defendants' position that the encounter between Dorman and Jordan did not legally constitute a "seizure." The court disagrees.

Stops under the Fourth Amendment fall into three categories. In consensual exchanges, the most innocuous of these stops, the police may briefly stop a citizen for questioning without committing a seizure, so long as the citizen recognizes that at all times he or she is free to leave. Florida v. Bostik, 501 U.S. 429, 111 S.Ct. 2382, 2386 (1991). These sort of exchanges need not be supported by any suspicion that the citizen is engaged in any wrongdoing, because the citizen is not being detained in any manner and remains free to disengage at any time. A second type of stop, commonly referred to as a Terry stop, allows police to seize a citizen for a brief period of investigation. This class of stop is not consensual, and must be supported by "reasonable suspicion." See Terry v. Ohio, 392 U.S. 1, 20-22 (1968); United States v. Holzman, 871 F.2d 1496, 1502 (9th Cir. 1989). Finally, the police may make a full-blown arrest of a citizen. This sort of seizure is non-consensual as well, and demands that the officer have probable cause to support the arrest. Adams v. Williams, 407 U.S. 143, 148-49 (1972).

In considering whether a stop is a seizure or merely a consensual exchange, the Supreme Court has observed that:

9 - ORDER

> [A] person is "seized" only when by means of physical force or a show of authority, his freedom of movement is restrained. . . . As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

United States v. Medenhall, 446 U.S. 544, 553-54 (1980).  Thus, the "essential inquiry is whether the person stopped reasonably believed that he or she was not free to leave." United States v. Patino, 649 F.2d 724, 726-27 (9th Cir. 1981) (citations omitted).  The inquiry is largely a factual one which depends on the totality of the circumstances.  What constitutes a restraint on one's liberty will vary depending on the police conduct at issue and the setting in which the conduct occurs.  Michigan v. Chersternut, 486 U.S. 567, 108 S.Ct. 1975, 1979 (1988).

Viewing the evidence in the light most favorable to the plaintiff, the record shows that a reasonable person in Jordan's position would not have felt free to leave.  Under Jordan and his companion's version of the events, Jordan noticed a patrol car pass by him, turn around, and stop between him and his destination.  It activated some portion of its overhead lights, and two officers emerged.  One of the officers, in full uniform, told him that he needed to talk to Jordan because he believed he was carrying a weapon.  Accepting plaintiff's description of the encounter, I must reject the proposition that at that moment, a reasonable person would feel free to ignore the directive of a uniformed officer.

First of all, an officer indicating that he needs to talk to a citizen inherently maintains an aura of command.  How commanding such a statement is, of course, is at least partially governed by non-verbal cues such as body language and tone of voice.  While it is not stated in the record in what manner Dorman spoke or in what position he held his body, that there was some degree of command imparted is a reasonable inference based on both Dorman's deposition testimony that had Jordan

continued on his way he would likely have detained him and on the nature of the stop - i.e., a belief that Jordan was carrying and concealing a gun.[3]

Also important to the analysis is Dorman's comment to Jordan that he stopped Jordan because he believed he was carrying a weapon. It is hard to imagine that a reasonable person, informed by the police that he was being stopped because of a suspicion that he was illegally armed, would feel free to ignore the officer and simply go along his way. This is particularly true in light of the policy of at least one major police department that officers are authorized to use deadly force based upon a reasonable belief that an individual poses an immediate threat of death or serious injury. See, e.g., Price v. Sery, Civ.No. 04-1178-MO, Order of 1/10/06 at 10-11 (D.Or.2006). The Price case involved the fatal shooting of James Perez, an African-American male who was suspected of having a concealed handgun on his person. The officer shot Perez because his hand was in his pocket and the officer believed he might have had a gun in his pocket. In fact, the decedent had no weapon. The police had no prior information regarding Perez, and had stopped him for failing to properly signal a right turn. The entire encounter between stop and fatal shooting lasted only 24 seconds.

Thus, while Jordan might not have felt he was acting suspiciously, it is not unreasonable for a person in that situation to feel compelled to satisfy an officer's concerns rather than gamble on whether that officer believed the person was acting suspiciously or threateningly when it is already clear that the officer believes the person is armed. An officer who believed Jordan was armed could

---

[3]Although Dorman's subjective belief that he would likely have detained Jordan had Jordan tried to leave is, standing alone, not relevant to the objective question of whether a reasonable person would have felt free to leave, it becomes relevant if there is reason to believe that the officer's belief was conveyed to Jordan. See Morgan v. Woessner, 997 F.2d 1244, 1253 n.5 (9th Cir. 1993). Given the circumstances - that Dorman was stopping Jordan for suspicion of carrying a concealed gun - it is not an unreasonable inference to believe that Dorman's subjective intent may have been conveyed to Jordan.

11 - ORDER

all too easily conclude that a furtive movement, such as a hand suddenly being placed on or near the waistband, presented an immediate threat. The most prudent course for a suspect under these circumstances is to keep his hands visible and allow the officer to determine whether his suspicions are accurate or unfounded. To do otherwise is to create risk. A reasonable person would not feel free to walk away under these circumstances.

Finally, the remaining facts, taken together and in conjunction with the above observations, also suggest that a reasonable person would not feel free to leave. The officers emerged from a marked patrol car with some portion of the overhead lights illuminated. There were two officers, both with their attention focused on Jordan. The officers were in uniform. Dorman addressed only Jordan, as opposed to the group as a whole. These factors also weigh in against defendants' contention that the meeting was consensual and that Jordan was free to ignore Dorman's command.

The primary case cited by defendants in support of that contention, United States v. Kim, 25 F.3d 1426 (9th Cir. 1994), is distinguishable. In Kim, the Ninth Circuit affirmed a district court's finding, in a motion to suppress evidence, that the encounter between a plainclothes DEA agent and the defendant was a consensual encounter where each time the agent engaged the defendant he phrased his inquires in the form of requests and where during the discussions the defendant voluntarily offered to cooperate with subsequent DEA investigations. Rather than a uniformed officer with another officer visible in the background telling the defendant that he suspected he was carrying a weapon and that the officer needed to talk to him, as plaintiff alleges occurred here, in Kim the agent, in plainclothes and alone during much of the encounter,[4] "requested leave to ask him

_____

[4]Although other DEA agents were present in backup or surveillance mode, they were not visible to the defendant or present with the contacting agent for most of the encounter.

12 - ORDER

some questions." Kim, 25 F.3d at 1428. As noted by the court, "[t]he phrasing of Agent Aiu's request for permission to question Kim left open the possibility of a refusal and the positions in which DEA agents were posted did not entirely bar Kim's egress." Id. at 1431. As described above, plaintiff's version of the facts here is materially different.

Given that on plaintiff's version of the facts a seizure occurred in this case, defendants' next contention is that the seizure was constitutionally permissible because Dorman had a reasonable suspicion that plaintiff was committing the crime of carrying a concealed gun, and probable cause to issue plaintiff a citation for a pedestrian violation.

As to the question of whether the stop was permissible because Dorman could issue plaintiff a citation for a pedestrian violation, such a contention is undercut by Dorman's deposition testimony in which he noted that the only reason he stopped Jordan was because of his suspicion that Jordan was carrying a concealed weapon. See Deposition of Wayne Dorman (#40, Ex. 1) at 123 (in which Dorman states: "Well, there's that and then there's also while he had been committing a pedestrian violation, that wasn't the basis with which I used to make my stop which seems to me to be what a pretext stop is, if you use the basis of your stop on the violation to investigate something different, which was not at all what this was.") (emphasis supplied). Further undercutting the contention that the violation formed part or all of the basis for the stop is that it does not appear from the record that Dorman ever asked Jordan, or any of the group he was with, about the way in which they crossed the street, admonished the conduct that violated the City Code, or issued citations for the violation. It does not appear from the record to have played any role in the encounter.

As to the question of whether Dorman had a reasonable suspicion that Jordan was carrying a concealed weapon, thus providing the constitutionally-permissible basis for a Terry investigative

13 - ORDER

stop, the court finds that there are disputed issued of material fact which prohibit the granting of qualified immunity or summary judgment. Plaintiff and some of his companions have testified that plaintiff was walking with his arms swinging freely, was not walking any differently than his companions, and was not walking in any suspicious manner. Crediting that evidence, as the court must do at this stage of the litigation, a reasonable jury could conclude that Dorman did not have a reasonable suspicion that Jordan was carrying a concealed weapon.

Because, viewing the evidence in the light most favorable to the plaintiff, a reasonable person in plaintiff's position would not have felt free to leave the encounter with Dorman, and there was not a legally sufficient basis to stop him, plaintiff has sufficiently evinced a Fourth Amendment violation so as to defeat Dorman's motion for summary judgment based on qualified immunity.[5]

Defendants also seek summary judgment on plaintiff's § 1983 claim grounded in the Equal Protection Clause of the Fourteenth Amendment, again based on qualified immunity.

To successfully prosecute an equal protection claim, plaintiff must prove that Dorman acted in a discriminatory manner and that the discrimination was intentional. Bingham v. City of Manhattan Beach, 341 F.3d 939, 948 (9th Cir. 2003). To avoid summary judgment, plaintiff must produce evidence from which a reasonable jury could conclude that Dorman's actions were racially motivated. Id.; see also Keyser v. Sacramento City Unified School Dist., 265 F.3d 741, 754 (9th Cir. 2001).

Defendant argues that the facts in this case are similar enough to those in Bingham as to

_____

[5]The court need not engage in an analysis of whether the constitutional right at issue was clearly established. It cannot be seriously contested that a reasonable officer would not be aware of the constitutional confines of the Fourth Amendment's prohibition on unreasonable searches and seizures and what the requisite standard of suspicion to effect a stop is.

14 - ORDER

warrant application of the Ninth Circuit's finding there - that a white officer stopping an African-American motorist who claims the stop was unreasonable, with no other facts suggesting discrimination, does not make out an equal protection claim. However, the facts in this case are materially different. Although, as in Bingham, the dispute over the basis for the stop is between a white officer and an African-American citizen, in this case plaintiff has provided his own testimony and that of members of the group he was with who state that plaintiff was acting no differently than they were, yet plaintiff alone was called out for questioning and searched - evidence that Bingham, a motorist driving alone, did not have. Although Dorman claims that Jordan was acting differently from the other members of his group, and that it was the manner in which Jordan was walking, not his race, that inspired the stop, the court, in ruling on defendants' summary judgment motion, must view the evidence in the light most favorable to the plaintiff; if it rejected Officer Dorman's version of the encounter and accepted plaintiff's version, a reasonable jury could conclude that the stop was racially motivated. As such, neither qualified immunity nor summary judgment is appropriate.[6]

II.    **Plaintiff's § 1983 claims against the City of Eugene**

Plaintiff also brings a § 1983 claim against defendant City of Eugene, alleging that the constitutional violations described above stemmed from the official policies of the Eugene Police Department. Defendants seek summary judgment on that claim.

Pursuant to Monell v. Department of Social Services of City of New York, 436 U.S. 658

---

[6]Again, the second half of the qualified immunity analysis - whether a reasonable officer would have known that the conduct underlying the constitutional violation was unlawful - is unnecessary. Any reasonable officer would know that you cannot effect a stop based solely on an individual's race. Indeed, Dorman himself noted in his deposition that he was hesitant to stop Jordan at all because he was concerned about being accused of racial profiling in contravention of Eugene city policies.

15 - ORDER

(1978), a municipality can be held liable under § 1983 only for injuries inflicted pursuant to a municipal policy or custom which caused the deprivations of a plaintiff's constitutional rights. Id. at 694. A municipality cannot be held liable on a simple theory of respondeat superior. Id. at 692. "[W]hen execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." Id. at 694. Defendants assert that plaintiff has failed to demonstrate that such policies or customs existed in the Eugene Police Department or that such policies or customs caused the alleged violations of plaintiff's constitutional rights.

In paragraph 17 of his amended complaint, plaintiff lists the six policies he alleges were the underlying cause of the alleged constitutional violation:

1.    Allowing officers to make pretext stops without having a reasonable suspicion that a crime had been committed;

2.    Ratifying and approving police officers' stops and other actions which were based on racial profiling;

3.    Failing to discipline police officers who stop citizens based on racial profiling;

4.    Finding all racial profiling complaints brought against the police officers to be unfounded even when the incidents leading to these complaints had violated the constitutional rights of citizens;

5.    Failing to train and instruct police officers; and

6.    Stopping and searching a larger percentage of African-American males than men of other races.

However, plaintiff has not provided evidence from which a reasonable jury could conclude that any of the above policies exist, or were the causal force behind any constitutional injury suffered by plaintiff.

16 - ORDER

The chief source of evidence relied upon by plaintiff is the police department's own investigation of the events after plaintiff made complaints about the encounter. However, there is no evidence, save plaintiff's own conclusory statements, that the investigation was anything but thorough or that it failed to measure Dorman's conduct against appropriate, constitutional standards. That the investigation ultimately found that Dorman's conduct was not unlawful, and that plaintiff's complaints were variously "unfounded"or "not sustained," is not, standing alone, evidence of an illegal policy or a pattern or practice of conduct which could be construed as deliberate indifference to the constitutional rights of Eugene citizens. There is likewise no evidence that the department engages in the unlawful use of "pretext" stops. Although plaintiff notes that Eugene Police Department Chief Robert Lehner testified in his deposition regarding the stop of Jordan that "there's no question it's a pretext stop," Deposition of Robert Lehner (#64, Ex.7) at 93, taken in context it is clear that Lehner was noting that he believed that Dorman had a lawful basis to stop Jordan based on the pedestrian violation, and that stopping him on that basis was a "pretext" for investigating the concern about a concealed weapon. Such a stop is not an affront to the Constitution, so long as the stop - on the "pretextual" basis - is one that a reasonable officer would make. See United States v. Cannon, 29 F.3d 472, 476 (9th Cir. 1994). There is no evidence before the court that any pattern of pretext stops that might be found in the activities of the Eugene Police Department is based on unlawful or unreasonable grounds. Indeed, the only evidence before the court about the alleged use of pretext stops, based on the instructions Sgt. Fellman gave to Dorman and the other patrol officers on September 4, 2004, is that Fellman specifically instructed the officers to make only lawful stops and contacts. Deposition of Scott Fellman (#40, Ex.2) at 45-48.

The only other evidence offered by plaintiff to support municipal liability comes in the form

17 - ORDER

of a graduate student's study of vehicle stops by Eugene police officers in 2002 in which the student

found a higher percentage of African-American drivers were stopped than were Caucasian drivers.

Without deciding the question of whether this study would be admissible at trial, the court finds that

it does not provide support for a finding that any of the policies alleged by plaintiff existed or caused

his injuries. The study occurred two years prior to the events underlying this case and examined only

vehicular stops for traffic violations, which is a materially different situation than the one plaintiff

was involved with on September 5, 2004. Regardless, the author did not draw any conclusions from

the study about whether there were policy reasons for the reported discrepancy, and has noted that

the study did not prove that racial profiling occurred. Deposition of Vikas Gumbhir (#72, Ex.3) at

27-32. No reasonable jury could conclude from the study, even if it were admissible, that the city

has any of the policies alleged.

Because plaintiff has not provided evidence from which a reasonable jury could find that a

city custom or policy was the moving force behind the alleged constitutional violations, defendants'

motion for summary judgment on plaintiff's § 1983 claim against the City of Eugene is granted.

### III.    Plaintiff's battery claim

Defendants also seek summary judgment on plaintiff's claim that Dorman's two searches of

Jordan's person constituted unlawful batteries.[7]

A battery is an intentional harmful or offensive contact with another. Cook v. Kinzua Pine

Mills Co., 207 Or. 34, 48-49 (1956). To prove a battery, plaintiff must show that "the conduct which

brings about the harm [was] an act of volition on the actor's part, and [that] the actor . . . intended

---

[7]Dorman was acting in the scope of his employment and is immune from personal suit on this claim and the intentional infliction of emotional distress claim. See ORS 30.265(1). The claims are properly brought against the City.

18 - ORDER

to bring about a harmful or offensive contact or put the other party in apprehension thereof." Bakker v. Baza'r, Inc., 275 Or. 245, 249 (1976). It is not necessary that the contact cause physical harm if the contact is offensive or insulting. Id.

Plaintiff alleges that two discrete searches each constituted a battery - the initial search of plaintiff's waistband, and the subsequent, more thorough search conducted at plaintiff's insistence. The court finds that although the former could constitute a battery - it was, on plaintiff's version of the facts, a non-consensual, offensive contact - the second cannot. A plaintiff cannot invite a police officer to initiate a contact and subsequently sue for battery. By way of analogy, if a driver is pulled over for suspicion of driving under the influence, but a field sobriety test convinces the officer that the driver is not intoxicated, the driver cannot insist that the officer give him a breathalyser or blood test to definitively prove his innocence and then accuse the officer of battering him for administering the test. Invited contact of that nature, without more, cannot be considered unlawfully offensive. As such, defendants' motion for summary judgment on plaintiff's battery claim is denied for the first search, but granted for the second search.

## IV.    **Plaintiff's intentional infliction of emotional distress claim**

Defendants seek summary judgment on plaintiff's claim that Dorman's contact with Jordan constituted an intentional infliction of emotional distress ("IIED").

To prevail on a claim for IIED, a plaintiff must prove that (1) the defendant intended to inflict several emotional distress or knew his actions would cause severe emotional distress; (2) defendant's actions caused plaintiff severe emotional distress; and (3) defendant's actions constituted an extraordinary transgression of the bounds of socially tolerable conduct. McGanty v. Standenraus, 231 Or. 532, 543-51 (1995). With respect to the first element, a plaintiff can avoid having to prove

19 - ORDER

intent if he can show that defendant and he were in a "special relationship" which involved a duty of care separate from the alleged tort itself.  In that circumstance, to satisfy the first element a plaintiff need only prove that the defendant acted with knowledge that his actions would cause the emotional distress.  Torgeson v. Connor, 86 Or.App. 179, 181-82 (1987).  Such a relationship can also be relevant to whether the conduct was outrageous under the third element.  Erickson v. Christenson, 99 Or.App. 104, 107-08 (1989).

However, plaintiff here has not proved a special relationship existed between Dorman and Jordan, nor has he produced facts from which a reasonable factfinder could conclude that Dorman acted with the intent to cause serious emotional distress.

None of the Oregon cases in which the courts have found a special relationship have involved a police officer and a citizen during an investigatory encounter, a fact which plaintiff concedes. None of the situations cited by plaintiff in which the courts have found such a relationship - landlord/tenant, psychiatrist/patient, supervisor/employee, or bus driver/rider's families - are convincing analogies.  Further, although the court has not located a case in point, given the frequency with which police officers are accused of various affronts to citizens' civil rights, it is difficult for this court to imagine that the Oregon courts have never been afforded the opportunity to make clear that a police officer and a stopped citizen do enjoy such a relationship.  Given that on this issue of state law the Oregon courts have not made such a determination, this court should not be the first to do so.

Because he cannot show a special relationship, plaintiff must prove that Dorman acted with the intent to cause severe emotional distress, or that he was substantially certain that such several emotional distress would result.  Plaintiff has offered no evidence to suggest such.  Nothing suggests

20 - ORDER

that Dorman intended to inflict emotional distress, and even viewing the evidence in the light most favorable to the plaintiff, no reasonable jury could conclude that Dorman was substantially certain that the brief encounter he had with Jordan would have resulted in severe emotional distress.

Finally, even assuming, arguendo, that plaintiff has proven that he has suffered severe emotional distress, under Oregon precedent no reasonable factfinder could conclude that the encounter constituted an extraordinary transgression of socially tolerable conduct. See, e.g., Pakos v. Clark, 253 Or. 113 (1969) (allegation that a police officer told defendant that he was crazy and was going to put him in an insane asylum and take away his children was not sufficiently outrageous). Although plaintiff speculates that Dorman was motivated by racial animus in deciding to stop him, there is nothing from Dorman's behavior or actions during the stop that was extraordinarily outrageous. It is not contended that Dorman made any overt remarks that would be socially intolerable or behaved in anything but a polite and professional manner during the encounter. Plaintiff has his civil rights claim based on racial discrimination, as described above. Based on Oregon IIED precedent, he cannot successfully prosecute an IIED claim based on the evidence of Dorman's behavior that is presently before the court. Defendants' motion for summary judgment on plaintiff's IIED claim is granted.

## CONCLUSION

For the above stated reasons, defendants' motion (#36) for summary judgment is granted as to plaintiff's § 1983 claim against defendant City of Eugene based on Monell liability, plaintiff's battery claim as to the second search of plaintiff, and plaintiff's IIED claim. It is denied as to

///

///

21 - ORDER

plaintiff's § 1983 claims against Dorman on the bases of violations of his rights under the Fourth

and Fourteenth Amendments.  Defendants' motion to strike (#69) is denied as moot.


DATED this _12<sup>T</sup>_ day of June, 2006.


Thomas M. Coffin
United States Magistrate Judge


22 - ORDER